**Larry Leon CHANEY et al., Appellants,**

v.

**Margaret M. HECKLER, as Secretary of Health and Human Services.**

**No. 82–2321.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 20, 1983.

Decided Oct. 14, 1983.

Rehearing En Banc Denied Jan. 17, 1984.

Stephen M. Kristovich, Washington, D.C., with whom David E. Kendall, Washington, D.C., Joel Berger, and Anthony G. Amsterdam, New York City, were on the brief, for appellants.

Margaret G. Halpern, Atty., Dept. of Justice, Washington, D.C., with whom Robert B. Nicholson, Atty., Dept. of Justice, Washington, D.C., Thomas Scarlett, Chief Counsel, Food and Drug Admin., Washington, D.C., and Arthur N. Levine, Rockville, Md., Deputy Chief Counsel, Food and Drug Admin., were on the brief, for appellee.

Before WRIGHT and SCALIA, Circuit Judges, and WEIGEL,* Senior District Judge.

Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.

Dissenting opinion filed by Circuit Judge SCALIA.

---

* Of the United States District Court for the Northern District of California, sitting by designation pursuant to 28 U.S.C. § 294(d) (Supp. V 1981).

1. See 21 C.F.R. § 5.10 (1983) (delegating authority to the Commissioner of FDA).

2. The statute defines the term "new drug" to mean "[a]ny drug * * * not generally recognized, among experts * * *, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof * * *." 21 U.S.C. § 321(p)(1) (1976).

The Supreme Court has interpreted drugs to be "safe and effective" when there is an "expert consensus" founded upon "substantial evi-

## J. SKELLY WRIGHT, Circuit Judge:

In the Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. § 301 *et seq.* (1976 & Supp. V 1981), Congress has required the Secretary of Health and Human Services or her delegate, the Commissioner of the Food and Drug Administration (FDA),[1] to assure that all "new drugs" are "safe and effective" for use under the conditions prescribed, recommended, or suggested on the official labeling.[2] *Id.* § 355(a). Before the Commissioner can allow a "new drug" to be distributed in interstate commerce, FDA must assure the safety of the drug and the adequacy of its branding. *Id.* §§ 331, 355; *see also* 21 C.F.R. § 201 *et seq.* (1983). A drug is "misbranded," and impermissibly available for use by consumers, unless its labeling bears adequate directions for use and such adequate warnings against unapproved uses or methods of administration as are necessary for the protection of its users. 21 U.S.C. § 352(f). The Commissioner has previously interpreted FDCA's labeling requirements to impose upon FDA the "obligat[ion]" to investigate and take appropriate action against unapproved uses of approved drugs where such unapproved use becomes widespread or endangers the public health. *See Legal Status of Approved Labeling for Prescription Drugs; Prescribing for Uses Unapproved by the Food and Drug Administration,* 37 Fed.Reg. 16503, 16504 (August 15, 1972) (hereinafter *Policy Statement*).[3]

In this case we review FDA's decision to take *no* action—either investigatory or reg-

---

dence," as defined at 21 U.S.C. § 355(d). *See United States v. Rutherford,* 442 U.S. 544, 549–550 n. 7, 99 S.Ct. 2470, 2473–2474 n. 7, 61 L.Ed.2d 68 (1979).

3. FDA may enforce the statute by obtaining court-ordered injunctions, 21 U.S.C. § 332(a), fines and imprisonment, *id.* § 333, and seizures, *id.* § 334(a). FDA may also promulgate regulations and hold hearings, conduct examinations and investigations, require record keeping, make inspections, and issue public reports. *Id.* §§ 371–375.

In the area of unapproved uses of approved drugs, FDA has indicated that it will take, depending upon the facts of each case, any of the following actions: requiring a labeling change,

ulatory—against the unapproved use of approved drugs in state capital punishment systems. Appellants, eight prison inmates under sentence of death in Texas and Oklahoma,[4] claim that FDA has arbitrarily and capriciously refused to prevent the use of drugs not proven "safe and effective" as a means of human execution.[5] Their petition to FDA asserted that use of barbiturates and paralytics as capital punishment devices, without prior FDA approval, violates the "new drug" and "misbranding" provisions of FDCA, see 21 U.S.C. §§ 352, 355.[6] FDA, in response, asserted that its jurisdiction did not extend to the regulation of state-sanctioned use of lethal injections and that, even if it did, FDA would, as a matter of its inherent enforcement discretion, undertake no investigatory or regulatory activity. Letter dated July 7, 1981 from the Commissioner to appellants' counsel (hereinafter Letter from the Commissioner), Joint Appendix (JA) 86–89. The District Court granted summary judgment against appellants' challenge to FDA's inaction. See Memorandum Opinion filed August 30, 1982 in D.D.C. Civil Action No. 81–2265 (hereinafter Dist.Ct.Op.), JA 215–231. Because we believe that FDA arbitrarily and capriciously refused to exercise its regulatory jurisdiction, we vacate the District Court's judgment and remand the case to it for further action consistent with this opinion.

## I. BACKGROUND

During the last six years at least five states, including Texas and Oklahoma, have enacted statutes adopting lethal injection as a means of human execution.[7] Prisons in these five states house over 200 of the approximately 1,100 persons sentenced to death in the United States, and at least six other states (with 300 persons on death row) apparently are considering adopting lethal injection as a means of capital punishment.[8] On December 7, 1982 Texas became the first state to actually administer a lethal injection to a condemned inmate.[9]

Because the lethal injection statutes authorize state prison officials to make unapproved use of drugs distributed in interstate commerce, appellants petitioned FDA to enforce the Act against the states.[10] Their December 19, 1980 petition recited the known evidence concerning lethal injection, which strongly indicates that such drugs pose a substantial threat of torturous pain to persons being executed. ROYAL COMMISSION ON CAPITAL PUNISHMENT, 1949–1953 REPORT (1953), Exhibit 1 to Letter dated December 19, 1980 from counsel for appellants to the Secretary of Health and Human Services (hereinafter Letter to the Secretary), JA 34–40. Appellants appended to their petition affidavits of leading medical and scientific experts which aver that there is no "expert consensus" founded upon "substantial evidence" that these drugs will produce death quickly and without pain and

approving the unapproved use, restricting the channel of distribution, and withdrawing the drug from the market. See Policy Statement, 37 Fed.Reg. at 16504.

4. Originally only Larry Leon Chaney and Doyle Skillern were on the petition. The remaining six appellants joined the petition by letter of January 12, 1981.

5. See Letter dated December 19, 1980 from counsel for appellants to Secretary, Department of Health and Human Services (hereinafter Letter to the Secretary) at 18–19, JA 31–32. A United States District Court has previously approved FDA's assertion that drugs used in animal euthanasia must be "safe and effective" and has approved the relevant criteria for making such determinations. See United States v. Beuthanasia-D. Regular, [1979

Transfer Binder] Food Drug Cosm.L.Rep. (CCH) ¶ 38265, at 39129 (D.Neb.1979).

6. Letter to the Secretary, supra note 5, at 3, 5, JA 16, 18.

7. See, e.g., Idaho Code § 19–2716, as amended by Idaho H.B. No. 752, Amendment to Section 1 (2d Sess., 46th Leg.) (March 31, 1982); N.M. Stat. 31–14–11; Okla.Stat. Tit. 22, § 1014; Tex. Crim.Pro. Code § 43.14; Wash.Rev. Code § 10.95.180.

8. Brief for appellants at 3.

9. Brief for appellee at 3 n. 3.

10. Filing of a citizen's petition is authorized and governed by 21 U.S.C. § 360g(a) & (f) and 21 C.F.R. § 10.30 (1983).

discomfort. Exhibit 2 to Letter to the Secretary, JA 43–83. Indeed, these affiants were not aware of *any* published data or investigations that would establish the effectiveness of such drugs for lethal injection. *Id.* With this evidence as grounds, appellants requested that FDA take the following actions:

1. Affix a boxed warning to the labels of the drugs specified for use in a lethal injection by statutes or prison policies in Texas, Oklahoma, Idaho and New Mexico that these drugs are not approved for use as a means of execution, are not considered safe and effective as a means of execution, and should not be used as a means of execution[;]

2. Prepare and send to the manufacturers of the drugs and to prisons and departments of corrections in Texas, Oklahoma, Idaho and New Mexico * * * notices advising that the drugs specified in those states' execution statutes or prison policies for use in an execution as well as any other drug or drugs are not approved for use as a means of execution, are not considered safe and effective as a means of execution, and should not be used as a means of execution;

3. Place in the Drug Bulletin an article advising that the drugs specified for use in a lethal injection by statutes or prison policies in Texas, Oklahoma, Idaho and New Mexico are not approved for use as a means of execution, are not considered safe and effective as a means of execution, and should not be used as a means of execution;

4. Adopt a policy and procedure for the seizure and condemnation from prisons or state departments of corrections of drugs which are destined or held for use as a means of execution; [and]

5. Recommend the prosecution of manufacturers, wholesalers, retailers and pharmacists who knowingly sell drugs for the unapproved use of lethal injection and prison officials who knowingly buy, possess or use drugs for the unapproved use of lethal injections.

Letter to the Secretary at 18–19, JA 31–32. In addition, appellants requested an evidentiary hearing on any issue of controlling fact. *Id.* at 19, JA 32.[11]

On July 7, 1981 the Commissioner of FDA, by letter, refused to take any of the actions requested in appellants' petition. Letter from the Commissioner at 2, JA 87. Rather than investigate appellants' claims, the Commissioner asserted that FDA's jurisdiction did not extend to the regulation of state-sanctioned use of lethal injections. *Id.* Indeed, because these were "duly authorized statutory enactments [that furthered] * * * proper State functions," the Commissioner indicated that, even if it had jurisdiction, FDA would not gather any evidence or pursue any enforcement. *Id.* at 3, JA 88. He noted two reasons for refusing to investigate or to enforce: (1) the case law on the unapproved use of drugs otherwise approved by FDA was not uniform, and (2) FDA had a policy of not initiating enforcement action against unapproved uses of approved drugs absent "serious danger to the public health." *Id.* The Commissioner could find no such "danger" where a state had properly enacted a capital punishment law. *Id.*

On September 16, 1981 appellants filed suit in the District Court seeking to compel FDA to fulfill its statutory obligation to investigate and to regulate the unapproved use of approved drugs in human execution systems. After limited discovery, both appellants and FDA filed cross-motions for summary judgment.

On August 30, 1982 the District Court granted summary judgment to FDA. The court declined to decide the jurisdictional issue, but went on to hold that "decisions of executive departments and agencies to *refrain* from instituting investigations and enforcement proceedings are essentially unreviewable by the courts." Dist.Ct.Op. at 10, JA 224 (emphasis in original). Thus FDA's "decision to refrain from interfering with the implementation of state capital punishment statutes constitutes a defensi-

---

11. Hearings may be held in the agency's discretion. 21 C.F.R. § 10.30(h)(2) (1983).

ble exercise of [its] considerable investigative and enforcement discretion * * *." *Id.* at 2, JA 216. The District Court noted that the Commissioner had explained FDA's reasons for not acting, *id.* at 13, JA 227, and, though the court could not review these reasons for their rationality,[12] it therefore found that FDA had not completely abdicated its statutory responsibilities, *id.* at 15, JA 229.

Larry Leon Chaney and the other seven prisoners then filed this appeal.

## II. FDA's JURISDICTION OVER LETHAL INJECTIONS

The Commissioner of FDA refused to investigate appellants' allegations or to assess and respond to the evidence they presented. Instead, he asserted that FDA did not have jurisdiction to interfere with state governments' use of prescription drugs for the purpose of causing death by injection. We disagree.

In determining whether FDA has jurisdiction over a particular drug or practice, the Supreme Court has counselled us to inquire "not merely * * * into statutory purpose," but also into the "various sorts of supervision [needed] to effectuate the goals of the Act * * *." *Toilet Goods Ass'n, Inc. v. Gardner,* 387 U.S. 158, 163–164, 87 S.Ct. 1520, 1524–1525, 18 L.Ed.2d 697 (1967). Jurisdiction is to be analyzed in terms of "consumer protection, not dialectics." *United States v. Urbuteit,* 335 U.S. 355, 357–358, 69 S.Ct. 112, 113–114, 93 L.Ed. 61 (1948). Congress clearly intended that the Act's "coverage be as broad as its literal language indicates * * *." *United States v. Bacto-Unidisk,* 394 U.S. 784, 798, 89 S.Ct. 1410, 1418, 22 L.Ed.2d 726 (1969). Thus the

Act has been held to apply to situations where drugs are held by retailers, *United States v. Sullivan,* 332 U.S. 689, 696–697, 68 S.Ct. 331, 335–336, 92 L.Ed. 297 (1948), wholesalers, *DeFreese v. United States,* 270 F.2d 730 (5th Cir.1959), *cert. denied,* 362 U.S. 944, 80 S.Ct. 810, 4 L.Ed.2d 772 (1960), bailees, *United States v. Wiesenfeld Warehouse Co.,* 376 U.S. 86, 92, 84 S.Ct. 559, 563, 11 L.Ed.2d 536 (1964), and physicians, *United States v. Evers,* 643 F.2d 1043 (5th Cir. 1981). As explained by the court in *United States v. 10 Cartons, Labeled in Part "Hoxsey",* 152 F.Supp. 360, 365 (W.D.Pa.1957), it "is not the holding for sale in a technical legal sense which gives rise to the federal jurisdiction * * * but the fact that the channels of commerce have been used." *See also United States v. Sene X Eleemosynary Corp.,* 479 F.Supp. 970, 981 (S.D.Fla. 1979) ("[t]he 'held for sale' standard of section 301 has long been afforded a liberal reading").

On appeal, FDA does not focus its energies on the argument that the unapproved use of drugs for lethal injection is outside the general jurisdictional provisions of the Act. Instead, FDA argues that state-sanctioned use of lethal injections comes within a commonly recognized exception to the Act's broad and protective coverage: the "practice-of-medicine" exemption. FDCA's legislative history expresses a specific intent to prohibit FDA from regulating physicians' practice of medicine.[13] According to the Commissioner, FDCA does not regulate physicians in their practice because physicians are licensed by the states. Letter from the Commissioner at 3, JA 88. Since state prisons are also licensed by the states, the Commissioner thought that FDA did not have jurisdiction to regulate the use

---

12. *See* note 37 *infra.*

13. The first bill to pass either house of Congress that was substantially similar to the present Act included within its definition of "drug" the qualification that it did not apply to "the regulation of the legalized practice of the healing art." S. 5, 74th Cong., 1st Sess. § 201(b), 79 Cong.Rec. 8351 (1935). In explaining this proviso the committee reports emphasized that the bill was "not intended as a medical practices act and [would] not interfere

with the practice of the healing art by chiropractors and others in the States where they are licensed by law to engage in such practice." S.Rep. No. 361, 74th Cong., 1st Sess. 3 (1935); S.Rep. No. 646, 74th Cong., 1st Sess. 1 (1935). While the definition of "drug" as ultimately enacted did not include this proviso, *see* 21 U.S.C. § 321(g) (1976), the legislative history makes clear that Congress did not want to limit a physician's ability to treat his patients.

of drugs in capital punishment systems. *Id.* at 2–3, JA 87–88.

The problem with the Commissioner's analogy is his starting point: that the practice of medicine is exempt because physicians are licensed by the states. There is scant legislative history on the subject,[14] but the few sentences that can be found are more fairly read as reflecting Congress' recognition that the states *do* regulate the practice of medicine and that a physician *cannot* be eligible for the practice-of-medicine exemption if he has not been so licensed. The practice-of-medicine exemption itself, however, cannot be attributed to the states' licensing of their physicians.

The better explanation for the practice-of-medicine exemption is that Congress did not want to interfere with physicians' treatment of their patients. New uses for drugs are often discovered after FDA approves the package inserts that explain a drug's approved uses. Congress would have created havoc in the practice of medicine had it required physicians to follow the expensive and time-consuming procedure of obtaining FDA approval before putting drugs to new uses.[15] Thus Congress exempted the practice of medicine from the Act so as not to limit a physician's ability to treat his patients.[16]

■ If FDA were correct that physicians' use of drugs is not within FDA's jurisdiction simply because physicians are licensed by the states, then it would necessarily follow that FDA could have no authority to regulate drugs that state-licensed physicians administer to prison inmates in experimental clinical investigations and no authority to regulate drugs that state-licensed veterinarians use to put animals to their death. But FDA has in fact regulated drugs used in prison clinical investigations, *see* 21 C.F.R. § 50.44 (1983), and in veterinary practices, *see United States v. Beauthanasia-D. Regular,* [1979 Transfer Binder] Food Drug Cosm.L.Rep. (CCH) ¶ 38265 (D.Neb.1979). In both situations FDA has rejected arguments that it does not have authority to regulate unapproved uses of approved drugs.[17] Nonmedical use of lethal injections therefore cannot fall within the "practice-of-medicine" exemption simply

---

**14.** *See* S.Rep. No. 361, *supra* note 13, at 3, 5; S.Rep. No. 646, *supra* note 13, at 1, 2.

**15.** The "new drug" provisions of FDCA require the filing of a new drug application, including full reports of investigations with respect to the drug's safety and effectiveness; a full list of the articles used as components of the drug; a full statement of the composition of the drug; a full description of the methods used in, and the facilities and controls used for, the manufacturing, processing, and packing of such drugs; samples of the drugs and the articles used as components; and specimens of the labeling proposed to be used. 21 U.S.C. § 355(b). An applicant may have to wait up to six months for action and participate in hearings. *Id.* § 355(c) & (c)(2). Hence, these "new drug" provisions simply do not fit the reality of the clinical situation.

**16.** The case law under this and related statutes is consistent with our reading of the legislative history. *See United States v. Evers,* 643 F.2d 1043, 1044 (5th Cir.1981) (physician does not misbrand when he administers drug to his own patients); *see also United States v. Moore,* 423 U.S. 122, 96 S.Ct. 335, 46 L.Ed.2d 333 (1975) (physician violates related law when he sells illicit drugs to addicts); *United States v. Collier,* 478 F.2d 268 (5th Cir.1973) (physician using drugs is outside the scope of the practice of medicine).

Indeed, FDA's prior interpretation of the relevant legislative history matches our own.

Throughout the debate leading to enactment [of the Act], there were repeated statements that Congress did not intend the Food and Drug Administration to interfere with medical practice and references to the understanding that *the bill did not purport to regulate the practice of medicine as between the physician and the patient.* Congress recognized a patient's right to seek civil damages in the courts if there should be evidence of malpractice, and declined to provide any legislative restrictions upon the medical profession.

*Policy Statement,* 37 Fed.Reg. at 16503 (emphasis added).

**17.** *See Protection of Human Subjects; Prisoners Used as Subjects in Research,* 45 Fed.Reg. 36388 (May 30, 1980) (rejecting argument in context of drug investigations with state prisoners); Answer of Defendant in D.D.C. Civil Action No. 81–2265, at ¶ 20, JA 91 (admitting that FDA has previously taken the position that new drug applications demonstrating the safety and effectiveness of chemicals used to put dogs to sleep must be filed).

because the states license their prison facilities.[18]

FDA did suggest cursorily in both its brief on appeal, brief for appellee at 26 n. 25, and its initial Letter from the Commissioner, JA 86–88, that the use of drugs for lethal injections, even if not covered by the practice-of-medicine exception, falls outside the jurisdictional ambit of the FDCA. The dissent to this opinion has graciously elaborated FDA's alternative argument; while acknowledging the inapplicability of the practice-of-medicine exception, the dissent argues that "FDA jurisdiction depends upon the existence of misbranding under § 331(k), which cannot be established under the facts of this case." Dissent at 1198.

Section 331(k) prohibits any action taken upon a "food, drug, device, or cosmetic, if such act is done while such article is held for sale (whether or not the first sale) after shipment in interstate commerce and results in such article being adulterated or misbranded." 21 U.S.C. § 331(k). The dissent contends that no misbranding could have occurred in the present case because the drugs that prisons hold for use in lethal injections cannot be deemed to be "held for sale" under any "conceivable interpretation of the English language." Dissent at 1199.

This rhetorical flourish masks what is in essence a "plain meaning" argument, and we do not fulfill our interpretive role when we look only to the statutory language. Inquiry into the statutory scheme and legislative history of the FDCA and subsequent amendments reveals a specific congressional intent to prevent misbranding of drugs at each stage of the distribution process from manufacturer to patient. *Accord United States v. Evers,* 643 F.2d 1043, 1049 (5th Cir.1981). In the first place, Section 331(b) of the FDCA, which prohibits any misbranding in "interstate commerce," should be sufficiently broad to cover the actions of the state prisons in this case, given the modern constitutional understanding of the breadth of congressional power under the commerce clause. Moreover, Congress enacted the "held for sale" provision of Section 331(k), on which the dissent relies, to expand, not to limit, the ambit of the FDCA. Prior to addition of this language in 1938, the FDCA had been open to an interpretation, under the more restrictive reading of the phrase "interstate commerce" then prevailing, that excluded from the Act's coverage the penultimate actor in the distribution chain if that entity had neither received nor transmitted a misbranded drug in interstate commerce. Filling this potential gap in the statute's protective scheme, Congress enacted Section 331(k) with the specific and explicitly stated intent to "extend the protection of consumers contemplated by the law to the full extent constitutionally permissible." H.R. Rep. No. 2139, 75th Cong., 3d Sess. 3 (1938). The drugs that states use have moved through the channels of interstate commerce, *see* Memorandum in Support of Defendant's Motion to Dismiss at 15, JA 141, and Congress thus is well within its constitutional powers when it seeks to regulate the use to which these drugs are put. In light of Congress' express intent to exercise these powers to the hilt in Section 331(k), it would be both ironic and impermissible for

---

**18.** FDA's contention that the Act embodies congressional deference to state law in "several other respects" is further evidence of its misreading of congressional intent. FDCA is based upon the Commerce power, and the fact that the Act does not apply to wholly intrastate activity simply reflects the limits of Congress' powers, not deference to all state-mandated activity. Likewise, FDA's claim that "the Act generally defers to state law in areas that do not directly conflict with it," brief for appellee at 18, is a curious way of stating the obvious proposition that a state may at times regulate in areas in which Congress has elected not to regulate. But the Supremacy Clause of the Constitution still preempts any state law, like a lethal injection statute, that conflicts with federal law. *See Arkansas v. Kansas & Texas Coal Co.,* 183 U.S. 185, 189, 22 S.Ct. 47, 48, 46 L.Ed. 144 (1901). And the Supreme Court has concluded that FDCA should be read broadly, even if doing so "would result in far-reaching inroads upon customary control by local authorities of traditionally local activities * * *." *United States v. Sullivan,* 332 U.S. 689, 693, 68 S.Ct. 331, 334, 92 L.Ed. 297 (1948).

this court to construe that section so as to limit FDA's jurisdiction in this case.[19]

In apparent recognition of the broad scope of the term "held for sale," the dissent must strain to argue that Section 331(k) nonetheless does not apply because the prison officials in this case are not the penultimate actors at whom this section is aimed, but rather the ultimate consumers of the drug and thus beyond the strictures of the Act. This view blinks reality. The ultimate consumer is not the last person to purchase the drug, but the last person to *consume* the drug—usually a patient, as *United States v. Evers* notes, 643 F.2d at 1049, but in this case the prisoner who receives the lethal injection. That the prisoner might be an unwilling consumer does not change the fact that the prisoner is the one who will suffer an excruciating death if this unapproved administration is conducted improperly. Styling the ultimate purchaser as the ultimate consumer, the dissent would free from the strictures of the FDCA any use to which the purchaser wished to put the drugs. Such a reading thwarts the ultimate purpose of Section 331 of the FDCA—protection of those who consume drugs from the potential harm of misbranding by anyone in the chain of distribution.[20]

■■■ FDA admits that it has jurisdiction over all state laws "that purport[ ] to legitimize the lawful shipment of an unapproved drug in interstate commerce, or that purport[ ] to permit its misbranding after shipment * * *." Brief for appellee at 20 n. 21. The states' lethal injection statutes purport to mandate the use of certain prescription drugs for a purpose not listed on their label. The activity of the states falls within the jurisdictional ambit of Section 331 of the FDCA, and the practice-of-medicine exception does not immunize this activity from the FDCA's prohibition of misbranding. FDA therefore must have jurisdiction to regulate such activity.[21]

### III. ENFORCEMENT DISCRETION

Of course, FDA determined that even if it had jurisdiction it would choose, in its

---

**19.** *Accord United States v. Sene X Eleemosynary Corp.,* 479 F.Supp. 970, 981 (S.D.Fla.1979) ("[t]he 'held for sale' standard of section 301 [29 U.S.C. § 331] has long been afforded a liberal reading"); *United States v. 10 Cartons Labeled in Part "Hoxsey",* 152 F.Supp. 360, 365 (W.D.Pa.1957) (it "is not the holding for sale in a technical legal sense which gives rise to the federal jurisdiction * * * but the fact that the channels of commerce have been used.").

**20.** *United States v. Evers, supra* note 16, does not support a restrictive reading of the "held for sale" language in this case. In *Evers* the court held that a physician did not violate the FDCA when he held certain approved drugs for treatment of his patients and simultaneously advertised and advocated a treatment program that involved an unapproved use of those drugs. Although the physician had both held drugs for sale and advocated unapproved use of the drugs without proper instructions, the court found no violation on the basis of the unique facts of the case. The persons for whose benefit the physician held the drugs—his patients—were not the persons to whom the physician owed the statutory duty to give adequate instructions. The practice-of-medicine exception exempted the physician from the duty not to advocate an unapproved use to his patients. The duty ran to other physicians who might hear his advertisement of the unapproved treatment process and might therefore use the drugs without adequate instructions. Thus the physician neither "held for sale" to the doctors to whom he owed a statutory duty not to misbrand, nor owed a duty to the patients to whom he "held for sale." Under these unique facts, no violation was made out.

*Evers* is clearly distinguishable from the present case. In this case the persons to whom the prisons owe a statutory duty are the same persons for whom the prisons hold the drugs for sale—the prisoners. The FDA cannot, under these circumstances, succeed in its claim that it lacks jurisdiction.

**21.** FDA's determination that it does not have jurisdiction over drugs used in lethal injections is entitled to only the most limited deference because it is inconsistent with longstanding FDA and court interpretation of the Act. *See FEC v. Democratic Senatorial Campaign Committee,* 454 U.S. 27, 37, 102 S.Ct. 38, 44, 70 L.Ed.2d 23 (1981); *Zenith Radio Corp. v. United States,* 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978). Where an agency's interpretation contradicts the express language and purpose of a statute, courts give that interpretation little deference. *See, e.g., FPC v. Conway Corp.,* 426 U.S. 271, 279, 96 S.Ct. 1999, 2004, 48 L.Ed.2d 626 (1976); *Office of Consumers' Counsel v. FERC,* 655 F.2d 1132, 1141–1142 (D.C.Cir.1980); *Elizabethtown Gas Co. v. FERC,* 575 F.2d 885, 887–889 (D.C.Cir.1978).

inherent enforcement discretion, not to investigate or to take any regulatory action. Letter from the Commissioner at 3, JA 88. The District Court held both that FDA's decision to refrain from investigation and enforcement was unreviewable and that, in any event, the decision did not amount to a complete abdication of statutory responsibility. Dist.Ct.Op. at 10–15, JA 224–229. We find that the District Court misunderstood and misapplied its review authority.

### A. Judicial Review of Enforcement Discretion

Section 10 of the Administrative Procedure Act (APA), 5 U.S.C. § 701(a) (1982), governs judicial review of agency action. Under Section 10, all final agency action is subject to judicial review unless such review is precluded by statute or committed to agency discretion by law. 5 U.S.C. § 701(a)(1) & (2).[22] This section establishes a "strong presumption" of reviewability, and the exceptions of 5 U.S.C. § 701(a)(1) & (2) should therefore be construed narrowly. See Dunlop v. Bachowski, 421 U.S. 560, 567 & n. 7, 95 S.Ct. 1851, 1858 & n. 7, 44 L.Ed.2d 377 (1975); Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971); Abbott Laboratories v. Gardner, 387 U.S. 136, 140–141, 87 S.Ct. 1507, 1510–1512, 18 L.Ed.2d 681 (1967); WWHT, Inc. v. FCC, 656 F.2d 807, 809, 815 (D.C.Cir.1981); Natural Resources Defense Council, Inc. v. SEC, 606 F.2d 1031, 1043 (D.C.Cir.1979).[23]

**22.** The APA defines "agency action" to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act," 5 U.S.C. § 551(13) (1982) (emphasis added), and gives courts the power to "compel agency action unlawfully withheld or unreasonably delayed," id. § 706(1). Thus the APA authorizes courts to review agency decisions to refrain from taking action. See, e.g., Dunlop v. Bachowski, 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975) (explicitly approving review of decision of Secretary of Labor not to file suit to invalidate union election); WWHT, Inc. v. FCC, 656 F.2d 807 (D.C.Cir.1981) (reviewing FCC denial of petition to institute rulemaking proceedings); Carpet, Linoleum & Resilient Tile Layers, Local Union No. 419 v. Brown, 656 F.2d 564 (3d Cir.1974) (requiring FHA to make reasonable efforts to ascertain whether homes with insured mortgages meet municipal housing code standards); Adams v. Richardson, 480 F.2d 1159 (D.C.Cir.1973) (en banc) (per curiam) (requiring HEW to commence enforcement proceedings against certain segregated school districts and systems); Environmental Defense Fund, Inc. v. Ruckelshaus, 439 F.2d 584 (D.C. Cir.1971) (requiring Secretary of Agriculture to cancel registration of DDT by issuing cancellation notices).

**23.** The dissent claims that these cases, or at least the portions cited, do not involve the committed-to-agency-discretion exception of 5 U.S.C. § 701(a)(2), which is at issue in this case, but rather the precluded-by-statute exception of § 701(a)(1), which is not. See Dissent at 1193. This claim is flatly inaccurate. In Natural Resources Defense Council, Inc. v. SEC, 606 F.2d 1031 (D.C.Cir.1979), Judge McGowan's opinion, at page 1043, states that both § 701(a)(1) and § 701(a)(2) create a "strong presumption of reviewability." Later on the same page the opinion reiterates the point with respect to § 701(a)(2), noting that it applies only "in rare instances." Id. And on the following page the opinion articulates a test for deciding whether an action is committed to agency discretion under § 701(a)(2) that requires an inquiry as to "whether the considerations in favor of nonreviewability * * * are sufficiently compelling to rebut the strong presumption of judicial review." Id. at 1044. Similarly, both Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), and WWHT, Inc. v. FCC, 656 F.2d 807 (D.C.Cir.1981), held, on the pages cited in this opinion, that the APA created a strong presumption of reviewability in the context of a discussion of both § 701(a)(1) and § 701(a)(2). 387 U.S. at 140–141, 87 S.Ct. at 1510–1511; 656 F.2d at 809 (citing the very page in Natural Resources Defense Council, Inc. v. SEC, supra, cited in this opinion, 606 F.2d at 1043); see also WWHT, Inc. v. FCC, supra, 656 F.2d at 815 (discussing the issue in more detail and making clear that it is a § 701(a)(2) case). The dissent, moreover, contradicts itself on precisely this point when it later acknowledges that "Natural Resources Defense Council states that the totality of § 701(a) * * * creates a 'strong presumption of reviewability,' 606 F.2d at 1043. Undoubtedly so." Dissent at 1195 (emphasis in original).

More importantly, the neat demarcation that the dissent seeks to draw between the precluded-by-statute and committed-to-agency-discretion exceptions to review tends to muddy the analysis in this area. Under § 10 claims of nonreviewability are disfavored, whatever their source. The Supreme Court's analysis in Abbott Laboratories v. Gardner, supra, is instructive. In deciding whether pre-enforcement review of an FDA regulation was appropriate, the

Neither FDA nor the District Court claims that FDCA precludes judicial review.[24] Rather, both assert that FDCA gives FDA *absolute* discretion over decisions concerning investigation and enforcement, Letter from the Commissioner at 3, JA 88; Dist.Ct.Op. at 10, JA 224, and thus commits those decisions to agency discretion by law. 5 U.S.C. § 701(a)(2). Though some courts have traditionally displayed reluctance to review exercises of enforcement discretion, the Supreme Court has consistently instructed us to construe narrowly the "committed to agency discretion" exception,

and to find it applicable only in those rare instances where the governing statute is "drawn in such broad terms that in a given case there is no law to apply." *Citizens to Preserve Overton Park, Inc. v. Volpe, supra,* 401 U.S. at 410, 91 S.Ct. at 821, *quoting* S.Rep. No. 752, 79th Cong., 1st Sess. 26 (1945).[25] This admonishment applies with no less force to review of agency enforcement discretion, including agency decisions to refrain from enforcement action. *Dunlop v. Bachowski, supra,* 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377.

Court noted that "a survey of our cases shows that judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe such was the purpose of Congress," 387 U.S. at 140, 87 S.Ct. at 1511, went on to point out that the "Administrative Procedure Act * * * embodies the basic presumption of judicial review so long as no statute precludes such relief or the action is not one committed by law to agency discretion," *id.,* and concluded that "only upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." *Id.* at 141, 87 S.Ct. at 1511 (*quoting Rusk v. Cort,* 369 U.S. 367, 82 S.Ct. 787, 7 L.Ed.2d 809 (1962)). One important question we must ask, therefore, is whether Congress intended to grant FDA unreviewable power in the enforcement area. We find no evidence of such an intention in this case.

The dissent also seeks to deflect the force of the principle stated in *Natural Resources Defense Council, supra,* and *WWHT, Inc., supra,* with the argument that these cases are inapposite to the present controversy because they involved the reviewability of rulemaking, not enforcement, decisions. *See* Dissent at 1194–1195. But it is the dissent that misses the mark. We do not rely on these cases to support the proposition that because rulemaking decisions can be reviewed enforcement decisions perforce can be reviewed. Rather, we simply follow the consistent construction of § 10 of the APA articulated in *Natural Resources Defense Council* and *WWHT, Inc.* This consistent construction establishes a strong presumption of reviewability in cases under § 10. The courts in *Natural Resources Defense Council* and in *WWHT, Inc.* evaluated the reviewability of the rulemaking decisions at issue in light of this strong presumption. Similarly, we take cognizance of the strong presumption as we undertake our evaluation of the reviewability of the exercise of enforcement discretion at issue in the present case.

**24.** The statute has detailed provisions that specifically contemplate judicial review. *See, e.g.,* 5 U.S.C. § 332(a) (jurisdiction of courts over injunction actions); *id.* § 346a(i) (judicial review of regulations which establish tolerances for pesticide chemicals); *id.* § 348(g) (judicial review for controversies over food additives); *id.* § 355(h) (judicial review of new drug orders); *id.* § 360(g) (judicial review of premarketing provisions).

**25.** The dissent makes light of the importance of *Overton Park* to the resolution of this controversy. Dissent at 1193. *Overton Park* must, however, occupy a central place in our analysis: it defines the meaning of the committed-to-agency-discretion exception of § 701(a)(2) that is at issue here. To dilute the power of the Court's command that we give § 701(a)(2) an extremely narrow construction, 401 U.S. at 410, 91 S.Ct. at 820, the dissent argues that "[u]nless one assumes that the Supreme Court was casually setting forth a rule wildly out of accord with prior case law, the obvious meaning of 'narrow construction' was an application that would limit the exception to enforcement discretion and to a few other matters * * *." Dissent at 1193. Apparently the Supreme Court missed this "obvious meaning" in 1975 when the Court cited the relevant page of *Overton Park* to support its holding in *Dunlop v. Bachowski, supra* note 22, 421 U.S. at 567, 95 S.Ct. at 1857, that the Secretary of Labor's exercise of enforcement discretion was reviewable. The constricted reading of *Overton Park* is also difficult to square with the text of *Overton Park* itself; the opinion does not even hint at the meaning that the dissent would divine from it, but stresses that the § 701(a)(2) exception is "very narrow" and is to be applied in "rare instances." 401 U.S. at 410, 91 S.Ct. at 820. Moreover, the Court cited as direct support for its holding an article by Raoul Berger in which he specifically discusses and approves review of agency enforcement discretion. Berger, *Administrative Arbitrariness and Judicial Review,* 65 Colum.L.Rev. 55, 68 (1965).

The *Dunlop* case deserves close scrutiny because it held, on facts precisely analogous to those of the present case, that an agency decision not to exercise enforcement discretion was reviewable. In *Dunlop* an unsuccessful candidate for a union office complained to the Secretary of Labor that the election was fraudulent, and thus invoked 29 U.S.C. § 482, a provision of the Labor-Management Reporting and Disclosure Act that empowers the Secretary to investigate such complaints and to bring a civil action to set aside the election if warranted. 421 U.S. at 562–563, 95 S.Ct. at 1855–1856. The Secretary took no action in response to the complaint in *Dunlop,* and the unsuccessful union candidate sought review of that decision to refrain from exercising enforcement power. The Secretary argued that his action was unreviewable under Section 10 of the APA, and relied on both the precluded-by-statute and the committed-to-agency-discretion exceptions of Section 10 of the APA. 5 U.S.C. § 701(a)(1) & (2). Finding neither exception applicable, 421 U.S. at 567 & n. 7, 95 S.Ct. at 1858 & n. 7, the Court held that this discretionary decision to re-

frain from exercising enforcement power was reviewable.[26] In the present controversy appellants seek nothing more than what the disappointed union official sought in *Dunlop* : judicial review of an agency decision not to exercise enforcement power. *Dunlop* thus precludes a facile resolution denying review in this case because an exercise of enforcement discretion is at issue. We must, under the test of *Overton Park,* decide whether there is "law to apply" to FDA's nonenforcement decision in this case.

■ The determination of whether there "is law to apply" turns on such pragmatic considerations as whether judicial supervision is necessary to safeguard plaintiffs' interests, whether judicial review will unnecessarily impede the agency in effectively carrying out its congressionally assigned role, and whether the issues are appropriate for judicial review. *Natural Resources Defense Council, Inc. v. SEC, supra,* 606 F.2d at 1043–1044. We conduct this inquiry to determine whether the considerations favoring nonreviewability are sufficiently compelling to rebut the strong pre-

---

**26.** The Court in *Dunlop* explicitly rejected the Secretary's claim that the nonenforcement decision was an unreviewable exercise of prosecutorial discretion, and expressly adopted the reasoning of the lower court on this point. 421 U.S. at 567 n. 7, 95 S.Ct. at 1858 n. 7. The Circuit Court, in *Bachowski v. Brennan,* 502 F.2d 79 (3d Cir.1974), had advanced two rationales for holding that the Secretary's decision should not be viewed as unreviewable prosecutorial discretion. First, "the doctrine of prosecutorial discretion should be limited to those civil cases which, like criminal prosecutions, involve the vindication of societal or governmental interest, rather than the protection of individual rights." 502 F.2d at 87. Second, appropriate legal standards existed against which the Secretary's conduct could be measured. *Id.* at 88.

These considerations apply with equal force to the present controversy. The FDCA provisions are intended not only to protect the general welfare, but also specifically to protect the individuals on whom drugs are used. Since appellants in this case are involuntary users of the drugs, they stand in a position analogous to the unsuccessful union official in *Bachowski v. Brennan;* if the agency refuses to act, appellants are left unprotected. 502 F.2d at 87–88. "Absolute discretion in this situation seems particularly inappropriate." *Id.* Moreover,

clear legal standards exist against which the agency action at issue can be measured; in the words of *Overton Park,* there is "law to apply." *See* notes 27 & 28 and accompanying text *infra.*

To blunt the precedential force of *Bachowski v. Brennan,* the dissent mischaracterizes the holding as an exceedingly narrow one, based on extraordinary circumstances that justified departure from the usual rule disfavoring review: "The court of appeals finds it necessary carefully to distinguish the type of enforcement responsibility given the Secretary under the L–MRDA from the more typical case in which a decision not to enforce is unreviewable. * * Thus *Dunlop* reaffirms the principle of general unreviewability of enforcement decisions." Dissent at 1193. The Court of Appeals in *Bachowski,* of course, intended just the opposite. The opinion takes pains to limit the applicability of notions of deference to prosecutorial discretion in the area of review of agency enforcement decisions. No language in the opinion even hints that the court viewed the case before it as atypical or extraordinary in any way. Nor does any language in the opinion state or even imply that the court acknowledged a general presumption against review; only with the addition of italics does the language quoted in the dissent even begin to hint at such a meaning. *See* Dissent at 1193.

sumption of judicial review. *Id.* In this case, however, we need not delve into a detailed analysis of nonreviewability because the agency has already conducted the inquiry for us. FDA, in an earlier policy statement, made law to govern and guide its discretion in regulating the unapproved use of approved drugs:

> Where the unapproved use of an approved new drug becomes widespread or endangers the public health, the Food and Drug Administration is obligated to investigate it thoroughly and to take whatever action is warranted to protect the public. * * * When necessary the Food and Drug Administration will not hesitate to take whatever action * * * may be required to bring possible harmful use of an approved drug under control.
>
> * * * Thus, where a manufacturer or his representative, or any person in the chain of distribution, does anything that directly or indirectly suggests to the physician or the patient that an approved drug may properly be used for unapproved uses for which it is neither labeled nor advertised, that action constitutes a direct violation of the Act and is punishable accordingly.

*Policy Statement,* 37 Fed.Reg. at 16504. This policy statement which FDA still considers binding and to have substantive effect, *see* Memorandum in Support of Motion to Dismiss at 4–5 & nn. 10, 12, JA 131–132, comes within the APA's definition of a rule [27] as that term has been consistently interpreted in this circuit. The term "rule" is "broad enough 'to include nearly every statement an agency may make * * *.'" *Center for Auto Safety v. NHTSA,* 710 F.2d 842, 846 (D.C.Cir.1983), *quoting Batterton v. Marshall,* 648 F.2d 694, 700 (D.C.Cir.1980). In *Center for Auto Safety* the court concluded that agency policy statements accompanying the withdrawal of a notice of proposed rulemaking fell within the definition of "rule" because they "clearly interpret the relevant statute and indicate NHTSA's policy regarding the exercise of discretion granted to it by that legislative enactment." 710 F.2d at 846. The FDA policy statement quoted above also interprets the relevant statute and indicates FDA's policy regarding the exercise of its discretion.[28] The policy statement, along with the precise terms of the statute [29] and a growing body of case law,[30] thus provides this court with more than enough law to apply.[31] Where a court has "law to apply"

**27.** *See* 5 U.S.C. § 551(4) (1982) (a "'rule' means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement * * * law or policy"). An agency statement that is binding and that has substantive effect is a rule. *See Guardian Federal S. & L. Ass'n v. Federal S. & L. Ins. Corp.,* 589 F.2d 658, 666–669 (D.C. Cir.1978); *Pickus v. United States Board of Parole,* 507 F.2d 1107, 1112–1113 (D.C.Cir. 1974).

**28.** That the Policy Statement accompanied an unadopted rule is not decisive. FDA has admitted that the Policy statement is an authoritative statement of agency views as to what the statute under which it operates requires. Memorandum in Support of Motion to Dismiss at 4–5 & nn. 10, 12, JA 131–132; Letter from the Commissioner at 2, JA 87. This admission, moreover, eviscerates any potential argument that FDA renounced the guidelines in the policy statement when it withdrew the proposed rule that accompanied the statement. The withdrawal indicates not that FDA rejected the contents of the policy statement, but only that FDA decided that the proposed rule was not a

preferred method of putting the policy goals into effect.

**29.** *See* notes 1–3, 24 *supra* and accompanying text. FDCA's prohibitions are phrased in mandatory terms. *See, e.g.,* 21 U.S.C. § 333(a) (any person who violates § 331 "shall" be imprisoned or fined); *id.* § 336 (at minimum, Secretary must provide suitable written notice or warning of minor violations). The statute's legislative history indicates that Congress intended for courts to review and to grant appropriate relief against "any act or omission on the part of the Department in the administration of the act." S.Rep. No. 646, *supra* note 13, at 10.

**30.** *See, e.g., United States v. Evers, supra* note 16; *United States v. Beuthanasia-D. Regular, supra* note 5; *Hoffmann-LaRoche, Inc. v. Weinberger,* 425 F.Supp. 890 (D.D.C.1975); *American Public Health Ass'n v. Veneman,* 349 F.Supp. 1311 (D.D.C.1972).

**31.** 2 K. DAVIS, ADMINISTRATIVE LAW TREATISE §§ 7:26–7:28, 28:16 (2d ed. 1979 & 1982 Supp.). It is a well established precept that courts can review agencies for conformance to their rules

agency action is *not* committed to agency discretion and *is* subject to judicial review under the APA. *Citizens to Preserve Overton Park, Inc. v. Volpe, supra,* 401 U.S. at 410, 91 S.Ct. at 820.

The District Court did not review the APA's provisions governing judicial review or discuss the case law establishing the strong presumption of reviewability. Rather, it relied on cases articulating the venerable proposition that courts should not unduly interfere with prosecutorial discretion.[32] But this proposition has never been blindly applied: "[T]he decisions of this court have never allowed the phrase 'prosecutorial discretion' to be treated as a magical incantation which automatically provides a shield for arbitrariness." *Medical Committee for Human Rights v. SEC,* 432 F.2d 659, 673 (D.C.Cir.1970), *vacated as moot,* 404 U.S. 403, 92 S.Ct. 577, 30 L.Ed.2d 560 (1972).[33] Indeed, in the last twenty years federal courts have frequently forced agencies to implement and enforce their regulatory statutes, or at least to explain their failure to do so.[34] While the cases the District Court cited are distinguishable from the case at bar,[35] the real "key lies in

and regulations, especially where those rules are to have substantive effect. *See Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); *United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954).

**32.** Dist.Ct.Op. at 10–11, JA 224–225. The judicial reluctance to interfere with prosecutorial discretion arises from the lack of specific action to review, the lack of a record, separation of powers principles, the prosecuting agency's need to control its own resources, solicitude for the accused, and adverse effects on voluntary settlement. But both courts and commentators have convincingly demonstrated that these concerns do not justify committing agency enforcement action completely to administrative discretion or totally precluding judicial review. *See Dunlop v. Bachowski, supra* note 22, 421 U.S. at 571–572, 95 S.Ct. at 1859–1860; *Adams v. Richardson, supra* note 22, 480 F.2d at 1161–1163; 2 K. DAVIS, *supra* note 31, §§ 9:1–9:6 at 215–248; Vorenberg, *Decent Restraint of Prosecutorial Discretion,* 94 HARV.L.REV. 1521, 1545–1554 (1981); Note, *Judicial Review of Administrative Inaction,* 83 COLUM.L.REV. 627, 630–645, 658–661 (1983).

**33.** *See, e.g., Marshall v. Jerrico, Inc.,* 446 U.S. 238, 249–250, 100 S.Ct. 1610, 1616–1617, 64 L.Ed.2d 182 (1980) (reviewing claim that administrator had personal interest in outcome); *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) (reviewing claim that law was discriminatorily applied); *see also Blackledge v. Allison,* 431 U.S. 63, 76, 97 S.Ct. 1621, 1630, 52 L.Ed.2d 136 (1977) (reversing conviction on ground that prosecutor did not keep a promise).

**34.** *See* note 22 *supra.*

**35.** *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 138, 95 S.Ct. 1504, 1510, 44 L.Ed.2d 29 (1975), and *Vaca v. Sipes,* 386 U.S. 171, 182, 87 S.Ct. 903, 912, 17 L.Ed.2d 842 (1967), both hold, in dicta, that the General Counsel of the National Labor Relations Board has unreviewable discretion to refuse to initiate an unfair labor practice complaint. *Sears Roebuck* makes clear, however, that this agency discretion was unreviewable as a result of the explicit preclusive statutory command of 29 U.S.C. § 153(d), 421 U.S. at 138, and not as a result of any generalized presumption against review of agency enforcement discretion. Also, unreviewable enforcement discretion arises only under statutes which, unlike the FDCA, are *not* for the benefit of individuals, but only for the country as a whole. *See Bachowski v. Brennan, supra* note 26, 502 F.2d at 87 & n. 11, *rev'd on other grounds, but cited with approval on this point, Dunlop v. Bachowski, supra* note 22, 421 U.S. at 567 n. 7, 95 S.Ct. at 1858 n. 7. *Moog Industries, Inc. v. FTC,* 355 U.S. 411, 414, 78 S.Ct. 377, 380, 2 L.Ed.2d 370 (1958), simply held that the Federal Trade Commission's discretionary determinations to prosecute should "not be overturned in the absence of a patent abuse of discretion." *SEC v. Tiffany Industries, Inc.,* 535 F.Supp. 1160 (E.D.Mo.1982), simply did not involve judicial review of the propriety of an agency's exercise of enforcement discretion. *Newman v. United States,* 382 F.2d 479 (D.C.Cir.1967), involved the prosecutorial discretion of a United States Attorney in a criminal matter, a discretion that has always received the maximum degree of judicial deference.

*Kixmiller v. SEC,* 492 F.2d 641 (D.C.Cir. 1974), will not bear the weight of the assertion, made by the District Court and echoed in the dissent to this opinion, that the case supports a strong presumption against reviewability. The language at 644–645 of 492 F.2d, on which the District Court and the dissent rely, is most fairly read as holding that review is statutorily precluded on the facts of *Kixmiller.* And the three authorities that *Kixmiller* cites for its overbroad dictum that agency enforcement discretion is "generally unreviewable," 492 F.2d at 645 & n. 27, will not support such a position. The first, *Goldberg v. Hoffman,* 225 F.2d 463,

recognizing that the law has been in transition and that the case law * * * [is now] strongly on the side of reviewability." 2 K. DAVIS, ADMINISTRATIVE LAW TREATISE § 9:6, at 239–240 (2d ed. 1979).[36]

■ The District Court correctly noted that the "absence of a statutory exemption for state-mandated activity does not logically compel or even suggest * * * that the Commissioner has *no* discretion to refrain from initiating requested investigative and/or enforcement proceedings * * *." Dist.Ct.Op. at 15, JA 229 (emphasis in original). But neither does it mean that the Commissioner has absolute discretion in enforcement decisions or that these decisions are insulated from judicial review. The presumption is in favor of judicial review, and nothing in this case is sufficiently compelling to rebut this presumption. We must conclude that FDA's inaction here is subject to judicial review.[37]

### B.  *Scope of Judicial Review*

■ When reviewing informal agency action of this type a court must conduct a "searching and careful" review of the "whole record" to determine if the agency has been "arbitrary or capricious." *See* 5 U.S.C. § 706(2)(A) (1976); *FPC v. Transcontinental Gas Pipe Line Corp.,* 423 U.S. 326, 331, 96 S.Ct. 579, 582, 46 L.Ed.2d 533 (1976) (*per curiam*); *Citizens to Preserve Overton Park, Inc. v. Volpe, supra,* 401 U.S. at 416, 91 S.Ct. at 823. The court must, therefore, make a "searching and careful" review of both the administrative record,

466 (7th Cir.1955), involved not agency discretion but the pure prosecutorial discretion of a *United States Attorney in a criminal matter.* The second and third cases, *Vaca v. Sipes, supra,* 386 U.S. at 182, 87 S.Ct. at 912, and *Jacobsen v. NLRB,* 120 F.2d 96, 99 (3d Cir. 1941), both involved the enforcement discretion of the General Counsel of the NLRB that was later clarified by *Sears Roebuck, supra,* as being *statutorily* placed beyond judicial review, 421 U.S. at 138, 95 S.Ct. at 1510. Beyond these nonsupportive citations, the *Kixmiller* opinion provides no analysis to justify its posture of all but total deference to agency enforcement discretion. Most importantly, the limiting presumption stated in *Kixmiller* retains little force in light of subsequent decisions of this circuit, *see Natural Resources Defense Council, Inc. v. SEC, supra* note 30, 606 F.2d at 1043–1044, and of the Supreme Court, *see Dunlop v. Bachowski, supra* note 22, 421 U.S. at 567 & n. 7, 95 S.Ct. at 1858 & n. 7.

Moreover the two FDCA cases that the District Court cites do not hold that courts cannot review FDA's complete refusal to investigate and regulate an entire class of drugs. In *Nat'l Milk Producers Federation v. Harris,* 653 F.2d 339 (8th Cir.1981), the court reviewed and accepted FDA's reasons—good faith budgetary constraints—for not seeking to enforce certain regulations. *Id.* at 342. In *Cutler v. Kennedy,* 475 F.Supp. 838 (D.D.C.1979), the court refused on equity grounds to require FDA to take certain drugs off the market. *Id.* at 856. To the extent dicta in *Cutler* supports the broader proposition that certain FDA duties are not mandatory, and that FDA's actions cannot be reviewed, we expressly disapprove it.

**36.** In light of the strong presumption favoring judicial review articulated in *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402,

91 S.Ct. 814, 28 L.Ed.2d 136 (1971), and *Abbott Laboratories v. Gardner, supra* note 23, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681, elaborated in this circuit in *Natural Resources Defense Council, Inc. v. SEC, supra* note 23, 606 F.2d 1031, and *WWHT Inc. v. FCC, supra* note 23, 656 F.2d 807, and specifically made applicable to enforcement discretion in *Dunlop v. Bachowski, supra* note 22, 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377, the dissent's insistence that agency enforcement discretion is "generally unreviewable" has an anachronistic ring. *See* Dissent at 1195–1196. And the precedents on which the dissent places primary reliance are not helpful to it. *Kixmiller* has already been demonstrated to be seriously flawed. *See* note 35 *supra.  Curran v. Laird,* 420 F.2d 122 (D.C.Cir.1969) (*en banc*), is wholly inapposite to this case. *Curran* involved the reviewability of a decision by the Executive Branch about the composition of this nation's reserve fleet during the Vietnam war. A majority of the court held the decision to be committed to official discretion because "these decisions are inextricably intertwined with and permeated by assumptions and conclusions of national defense strategy." 420 F.2d at 131. The opinion was careful to point out that the Executive decision occurred in the context of a "national emergency," *id.* at 128. *Curran* not only failed to state anything remotely resembling the presumption of "general unreviewability" that the dissent would pull from it, but simply had nothing to do with the question of agency enforcement discretion.

**37.** Under the APA a negative, but final, disposition of an authorized petition for agency action is a final order subject to judicial review. *See* 5 U.S.C. § 551(6) (1982).

particularly the uncontroverted evidence submitted by appellant, and the agency's stated reasons for its action. If upon examination the agency record does not satisfy the appropriate standard of judicial review, its action must be vacated. If FDA's inaction in this case was arbitrary, capricious, and without authority of law,[38] and our own analysis of the record leads us to believe it was,[39] we must remand this case for appropriate action.

■ First, the Commissioner stated that the "scope of his legal authority" to regulate lethal injections in state capital punishment systems is "highly uncertain." Brief for appellee at 14. But this argument simply repeats his meritless contention that FDA did not have jurisdiction in the first place.[40] Moreover, it directly contradicts FDA's own policy statement, issued in 1972 and still in effect, which declares that FDA will investigate and take all necessary action to prevent the unapproved use of approved drugs. *Policy Statement,* 37 Fed. Reg. at 16504. The policy statement makes no exception for state-mandated activity, and the Commissioner must provide an acceptable explanation of why his refusal to act in this case is not in contravention of that 1972 statement.[41] So far he has not. A "good faith" uncertainty about legal authority may be sound reason to decline to bring enforcement proceedings, *see* brief for appellee at 15, but willful indifference is not. We do not understand how the Commissioner can assert legal authority to regulate drugs used in both state-licensed clinical investigations and state-licensed veterinary practices and not assert, *with equal confidence,* authority to regulate drugs used in state-licensed capital punishment practices.[42] It is simply irrational—and thus

---

**38.** The District Court reviewed the statement only to determine whether FDA had completely abdicated its statutory responsibilities. *See* Dist.Ct.Op. at 15, JA 229. This kind of review is applied to agency action taken pursuant to statutes which specifically preclude judicial review. Courts undertake such review only to ensure that the agency does not flagrantly ignore specific statutory mandates. *See, e.g., Leedom v. Kyne,* 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958); *Hotel Employees Local No. 255 v. Leedom,* 358 U.S. 99, 79 S.Ct. 150, 3 L.Ed.2d 143 (1958); *Office Employees Int'l Union, Local No. 11 v. NLRB,* 353 U.S. 313, 77 S.Ct. 799, 1 L.Ed.2d 846 (1957).

By contrast, when reviewing agency action under the "arbitrary and capricious" test, courts must assure themselves that the agency " 'has exercised a reasoned discretion, with reasons that do not deviate from or ignore the ascertainable legislative intent.' " *Lead Industries Ass'n, Inc. v. EPA,* 647 F.2d 1130, 1154 (D.C.Cir.1980) (*quoting Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 850 (D.C.Cir. 1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971)). Courts gain such assurance only by reviewing the facts relied upon, the other facts in the record, the relevant factors considered, and the available alternatives considered. *Ethyl Corp. v. EPA,* 541 F.2d 1, 34 (D.C.Cir.) (*en banc*), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976). The District Court did not, so far as we can tell, adequately explore the agency's decision to determine if it had engaged in reasoned decision-making.

**39.** The case was decided below on a motion for summary judgment. Therefore, appellants'

factual allegations that lethal injection does not cause a "quick and painless" death and that it "poses a substantial threat of torturous and unnecessary pain to persons being executed" must be assumed to be true. Complaint ¶ 18, JA 9. *See Wolston v. Reader's Digest Ass'n, Inc.,* 443 U.S. 157, 162 n. 5, 99 S.Ct. 2701, 2705 n. 5, 61 L.Ed.2d 450 (1979); *Bishop v. Wood,* 426 U.S. 341, 347 n. 11, 96 S.Ct. 2074, 2079 n. 11, 48 L.Ed.2d 684 (1976); *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

**40.** *See* Part II *supra.*

**41.** This policy statement asserted a broad responsibility to "investigate * * * and to take whatever action is warranted to protect the public." *Policy Statement,* 37 Fed.Reg. at 16504. It specifically recognized that the Act "did not purport to regulate the practice of medicine as between the physician and the patient." *Id.* at 16503. It mentioned nothing about exempting all state-licensed activity.

**42.** The Commissioner has not asserted, at any point, that budgetary constraints would prevent FDA from investigating and taking appropriate action. While we have no occasion to address this hypothetical explanation, we do note that other courts have rejected it in situations where Congress (or the agency) has promised that action will be taken. *See, e.g., Adams v. Califano,* D.D.C. Civil Action No. 70-3095 (Dec. 29, 1977); *Hoffmann-LaRoche, Inc. v. Weinberger, supra* note 30; *American Public Health Ass'n v. Veneman, supra* note 30.

arbitrary and capricious—to believe that the agency has jurisdiction over the unapproved use of drugs in the former two practices but not in the latter practice.

Second, the Commissioner asserts that the use of drugs in lethal injections does not pose a "serious danger to the public health." Brief for appellee at 15. But he cites no evidence to support this proposition. Rather, he irrebuttably presumes that "duly authorized statutory enactments * * * [which further] proper State functions" cannot, as a matter of law, pose such a danger to the public. Letter from the Commissioner at 3, JA 88. This claim is remarkable in light of the uncontroverted evidence appellants submitted to FDA, which shows that drugs used in lethal injections pose a substantial threat of torturous pain to persons being executed. ROYAL COMMISSION ON CAPITAL PUNISHMENT, 1949–1953 REPORT (1953), Exhibit 1 to Letter to the Secretary, JA 34–40. Furthermore, this claim flies in the face of the Commissioner's admission that FDA has jurisdiction over all state laws "that purport[] to legitimize the lawful shipment of an unapproved new drug in interstate commerce or that purport[] to permit its misbranding after shipment * * *." Brief for appellee at 20 n. 21. If *some* state laws can pose a "serious danger to the public health," *no* state law can be *presumed,* in the face of substantial evidence to the contrary, not to do so. Rather, FDA can rationally distinguish between laws that *do* endanger the public health and laws that *do not* only upon the basis of available evidence. In this case *all* the evidence shows that lethal injection laws *do* endanger users of drugs, and thus the public health.[43] Finally, this claim rationally cannot stand next to FDA's earlier assertions that prisoners in clinical investigations and dogs in veterinary clinics were in "serious danger" from the unapproved use of approved drugs. If drugs used in these contexts pose a "serious threat" to the public health, then certainly drugs used to kill human beings pose such a threat.[44] In short, the Commissioner presents no rational basis for concluding that lethal injections do not pose a serious health threat. Thus we must conclude that he has acted arbitrarily, capriciously, and without authority of law.[45]

**43.** We do not imply that FDA must gather evidence concerning the health effects of all alleged statutory violations to survive judicial scrutiny. We simply hold that FDA cannot irrebuttably presume that a particular practice does *not* pose a "serious danger to the public health" because that practice is sanctioned by state law. FDA must give rational reasons why the practice itself can be presumed to pose no danger to the public if it is to deny a petition without investigating the allegations, particularly where the petition presents substantial evidence to the contrary.

**44.** On appeal government counsel contend that lethal injection statutes cannot threaten the public health because, by definition, they apply only to a small number of persons convicted of capital offenses, and such persons have extensive legal protection under other laws. *See* brief for appellee at 15–16. As a preliminary matter, we note that courts properly affirm only on the basis of the agency's reasons, and not on the subsequent rationalizations of counsel. *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168–169, 83 S.Ct. 239, 245–246, 9 L.Ed.2d 207 (1962). But, more to the point, even government counsel's subsequent rationalizations would not make rational this response. Over 200 persons are presently subject to this alleged statutory violation, and over 900 more are potentially in danger. *See* text accompanying note 8 *supra.* Only a callous mind would claim that this is not a serious danger to public health. The claim is particularly irrational in light of FDA's regulation of clinical practices in state prisons, where an equally small number of prisoners serve as subjects in experiments. *See* 21 C.F.R. § 50.1 *et seq.* (1983). Finally, it is established doctrine that, unless Congress has specifically otherwise decided, resort to litigation on a private cause of action is not an adequate alternative to an administrative agency performing its lawful function. *See, e.g., Medical Committee for Human Rights v. SEC,* 432 F.2d 659, 672 (D.C.Cir. 1970), *vacated as moot,* 404 U.S. 403, 92 S.Ct. 577, 30 L.Ed.2d 560 (1972). *See also Megapulse, Inc. v. Lewis,* 672 F.2d 959, 970 n. 57 (D.C.Cir.1982) (discussing adequacy of alternative remedies); *Investment Co. Institute v. Board of Gov'rs of Fed. Reserve System,* 551 F.2d 1270, 1279–1280 (D.C.Cir.1977) (same); *Harris Stanley Coal & Land Co. v. Chesapeake & Ohio R. Co.,* 154 F.2d 450, 453 (6th Cir.1946) (same).

**45.** This conclusion is particularly compelling since FDA refused to take any action with regard to an *entire category* of allegedly pro-

## III. CONCLUSION

Judge Tamm, writing for this court over a decade ago, once noted that "assertions of discretion inevitably raise questions of degree which must be appraised in the context of the relevant provisions of law and the nature of the particular action sought to be reviewed: '[T]he question is not *whether* agency action is by law committed to agency discretion but *to what extent* agency action is so committed.' " *Medical Committee for Human Rights v. SEC, supra,* 432 F.2d at 673 (*quoting* 4 K. DAVIS, ADMINISTRATIVE LAW TREATISE 33 (1958) (emphasis by Judge Tamm). Agency enforcement decisions are inevitably based, in large measure, on factors not particularly suitable to judicial resolution, and thus courts give these decisions a great degree of deference. But courts are also responsible for ensuring that government officials do not negate or frustrate congressional enactments through bureaucratic arbitrariness. Courts must assure the public that the vast powers agencies exercise are subject to decent and civilized restraints.[46] In this case, despite expert testimony concerning the dangerousness of using barbiturates and paralytics to execute human beings, the Commissioner of FDA refused to take any investigatory or regulatory action. He provided a glib statement of reasons for the agency's inaction that cannot withstand judicial review. Hence, we must vacate the District Court's judgment in this case with instructions to order the agency to fulfill its statutory function. Both this court and the District Court must be mindful that endless litigation, particularly in this case, concerning the sufficiency of the agency's reasons would be inconsistent with the statute's goal of expeditiously protecting consumers from the alleged hazards. We must be prepared to compel FDA to take action with respect to the prayer for relief where an acceptable explanation of its inaction is not promptly forthcoming.[47]

Appellants have presented substantial and uncontroverted evidence to support their claim that execution by lethal injection poses a serious risk of cruel, protracted death. *See* ROYAL COMMISSION ON CAPITAL PUNISHMENT, 1949–1953 REPORT (1953), Exhibit 1 to Letter to the Secretary, *supra,* JA 34–40. Even a slight error in dosage or administration can leave a prisoner conscious but paralyzed while dying, a sentient witness of his or her own slow, lingering asphyxiation. *See* brief for appellants at 10–11. In light of these risks, FDA's impermissible refusal to exercise enforcement discretion over the use of drugs for lethal injection—a use well within the jurisdictional ambit of the FDCA, *see* Part II *supra* —may also implicate the Eighth Amendment's prohibition of cruel and unusual punishment.

In a civilized society, if we assume as we must that the state may take the life of a person as punishment, decency demands that the life be taken without cruelty. The Eighth Amendment embodies society's requirement that the means of punishment not be barbarous or torturous, *see Gregg v. Georgia,* 428 U.S. 153, 167–171, 96 S.Ct. 2909, 2922–2924, 49 L.Ed.2d 859 (1976); *In*

hibited activity. Courts are especially willing to review agency lassitude (or recalcitrance) of this magnitude. *See, e.g., White v. Mathews,* 559 F.2d 852 (2d Cir.1977), *cert. denied,* 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978) (challenging general delay in processing Social Security disability appeals); *Adams v. Richardson, supra* note 22 (challenging HEW's policy of not enforcing Title VI of the Civil Rights Act of 1964).

**46.** *See generally* Vorenberg, *supra* note 32.

**47.** There is ample precedent to support the District Court in affirmatively ordering agency action. *See, e.g., Adams v. Richardson, supra*

note 22, 480 F.2d at 1163–1164;. *Terminal Freight Handling Co. v. Solien,* 444 F.2d 699 (8th Cir.1971), *cert. denied,* 405 U.S. 996, 92 S.Ct. 1252, 31 L.Ed.2d 465 (1972); *Templeton v. Dixie Color Printing Co.,* 444 F.2d 1064 (5th Cir.1971); *Trailways of New England, Inc. v. CAB,* 412 F.2d 926 (1st Cir.1969). For other cases addressing agency inaction, *see* note 22 *supra.* The Supreme Court has not definitively addressed the issue, *see Dunlop v. Bachowski, supra* note 21, 421 U.S. at 575–576, 95 S.Ct. at 1861–1862, but its logic presupposes that a court can order an agency to take affirmative enforcement action. *See id.* at 592, 95 S.Ct. at 1869 (Rehnquist, J., concurring in the result in part and dissenting in part).

*re Kemmler,* 136 U.S. 436, 447, 10 S.Ct. 930, 933, 34 L.Ed. 519 (1890) ("punishments are cruel when they involve torture or lingering death"), and the Amendment gives even to those on death row the right to a punishment that is not cruel. In this case FDA is clearly refusing to exercise enforcement discretion because it does not wish to become embroiled in an issue so morally and constitutionally troubling as the death penalty. Yet this action amounts to an abnegation of statutory responsibility by the very agency that Congress has charged with the task of ensuring that our people do not suffer harm from misbranded drugs. *See* Part III–B *supra.*

Though this failure to meet statutory responsibilities is alone sufficient to invalidate the FDA's inaction in this case, we note that by failing to exercise its statutory responsibilities FDA also places serious burdens on appellants' right to a death that is not cruel. As a result of the FDA's inaction, appellants face the risk of a cruel execution and are deprived of the FDA's expert judgment as to the effectiveness of the drugs used for lethal injection, the latter fact making any direct challenge they might bring to this method of execution more difficult. Thus, even though FDA is not responsible for the execution of these prisoners, its failure to meet its statutory responsibility may well place constitutionally impermissible burdens on the Eighth Amendment rights of appellants.

*Vacated and remanded.*

SCALIA, Circuit Judge, dissenting:

The majority converts a law designed to protect consumers against drugs that are unsafe or ineffective for their represented use into a law not only permitting but mandating federal supervision of the manner of state executions. This implausible result is achieved by rewriting the law with regard to enforcement discretion and ignoring it with regard to FDA jurisdiction. I dissent from what seems to me a clear intrusion upon powers that belong to Congress, the Executive Branch and the states.

I would affirm for the reasons set forth in the district court's opinion.

## I. ENFORCEMENT DISCRETION

Even if it were correct that the Food, Drug, and Cosmetic Act makes the challenged drug use illegal, the majority's disposition of this case would not be supportable under well established law governing judicial review of agencies' enforcement discretion. Generally speaking, enforcement priorities are not the business of this Branch, but of the Executive—to whom, and not to the courts, the Constitution confides the responsibility to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3. Preserving that sound allocation of responsibility was one of the purposes, and has been perhaps the primary application, of that provision of the Administrative Procedure Act which excludes from judicial review "agency action ... committed to agency discretion by law." 5 U.S.C. § 701(a)(2) (1976). As this court has accurately stated, "[a]n agency's decision to refrain from an investigation or an enforcement action is generally unreviewable." *Kixmiller v. SEC,* 492 F.2d 641, 645 (D.C. Cir.1974). *See also Action on Safety and Health v. FTC,* 498 F.2d 757, 762 (D.C.Cir. 1974). The reason is well explained in a Supreme Court case that could more easily have been regarded as appropriate for judicial control of agency enforcement policy than the present one, since it involved non-enforcement against some companies combined with enforcement against others:

[I]n the shaping of its remedies within the framework of regulatory legislation, an agency is called upon to exercise its specialized, experienced judgment. Thus, the decision as to whether or not an order against one firm to cease and desist from engaging in illegal price discrimination should go into effect before others are similarly prohibited depends on a variety of factors peculiarly within the expert understanding of the Commission.... [T]he Commission alone is empowered to develop that enforcement policy best calculated to achieve the ends contemplated by Congress and to allocate its available

funds and personnel in such a way as to execute its policy efficiently and economically.

*Moog Industries v. FTC,* 355 U.S. 411, 413, 78 S.Ct. 377, 379, 2 L.Ed.2d 370 (1958). *See also Vaca v. Sipes,* 386 U.S. 171, 179, 87 S.Ct. 903, 911, 17 L.Ed.2d 842 (1967).

The majority opinion gives its view of enforcement discretion the appearance of reality by quoting from Supreme Court cases that assert a "strong presumption" of reviewability rebuttable only by "clear and convincing" legislative intent to negate review. Maj.Op. at 1183–1184 n. 23. These excerpts are misleading, since they are taken from cases or portions of cases that do not involve review of enforcement discretion. Indeed, all but one of them come from cases or portions of cases that do not even deal with the "committed to agency discretion" provision of the APA (§ 701(a)(2)), but rather with the provision that denies review "to the extent that . . . statutes preclude judicial review" (§ 701(a)(1)). The citation to *Dunlop v. Bachowski,* 421 U.S. 560, 567 n. 7, 95 S.Ct. 1851, 1858 n. 7, 44 L.Ed.2d 377 (1975), is illustrative. The court of appeals in that case, *Bachowski v. Brennan,* 502 F.2d 79 (3d Cir.1974), considered and rejected separate arguments by the Secretary of Labor that (1) the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 401 *et seq.* (1976) ("L–MRDA"), *precluded* judicial review of his failure to institute a civil action to set aside a tainted union election, 502 F.2d at 84–86, and (2) his decision not to prosecute was *committed to agency discretion, id.* at 86–88. The Supreme Court addressed the first of those arguments in detail, *Dunlop, supra,* 421 U.S. at 566–68, 95 S.Ct. at 1857–58. In the context of its *preclusion* discussion, the Court established that "[i]n the absence of an express [statutory] prohibition," there exists "the strong presumption that Congress did not mean to prohibit all judicial review," *id.* at 567, 95 S.Ct. at 1857. It is this statement upon which the majority here relies. In response, however, to the Secretary's second contention, which is the contention at issue in the present case, the Court

agree[d] with the Court of Appeals, *for the reasons stated in its opinion,* 502 F.2d 79, 86–88 (CA 3 1974), that there is no merit in the Secretary's contention that his decision is an unreviewable exercise of prosecutorial discretion.

*Id.* at 567 n. 7, 95 S.Ct. at 1858 n. 7 (emphasis added). An examination of the cited pages in the appellate court's opinion produces no language even hinting at a "strong presumption" of reviewability, but rather the contrary implication in its observation that *"[n]ot every* refusal by a Government official to take action to enforce a statute, however, is *unreviewable," Bachowski, supra,* 502 F.2d at 87 (emphasis added). The court of appeals finds it necessary to carefully distinguish the type of enforcement responsibility given the Secretary under the L–MRDA from the more typical case in which a decision not to enforce is unreviewable. *Bachowski, supra,* 502 F.2d at 87–88 & n. 11. Thus, *Dunlop* reaffirms the principle of general unreviewability of enforcement decisions.

The other Supreme Court cases cited by the majority also do not support its position. *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), has even less to do with the present case than the first portion of *Dunlop,* involving *neither* the "agency discretion" exemption (5 U.S.C. § 701(a)(2)) *nor* agency enforcement action. The Court held that Congress did not intend to "preclude judicial review" (5 U.S.C. § 701(a)(1)) of agency rule-making prior to the enforcement stage. 387 U.S. at 142, 87 S.Ct. at 1512. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971), at least involved the relevant provision of the APA; but it did not involve enforcement discretion, and therefore the Court's dictum to the effect that the exception for action "committed to agency discretion" is to be construed narrowly does not establish what the majority suggests. Unless one assumes that the Supreme Court was casually setting forth a rule wildly out of accord with prior case law, the obvious meaning of "narrow construction" was an

**1194**

application that would limit the exception to enforcement discretion and to a few other matters where either a strong tradition (and therefore congressional expectation) of judicial abstention exists, *see, e.g., Curran v. Laird,* 420 F.2d 122 (D.C.Cir.1969) (en banc), or a specific legislative commitment to discretion is evident, *see Dunlop v. Bachowski, supra,* 421 U.S. at 595, 95 S.Ct. at 1870 (Rehnquist, J., concurring in the result in part and dissenting in part).[1]

Cases in this circuit no more support narrowing the "agency discretion" exception by an across-the-board application of a "presumption of reviewability" than do the decisions of the Supreme Court.[2] We have sat en banc to consider the subject on two occasions. In the first case, *Curran v. Laird, supra,* we held that the Executive's decision not to withdraw ships from the national defense reserve fleet fell within the "span of executive actions—pertaining to the fleet's establishment, expansion, curtailment, maintenance and use—that are 'committed to agency discretion' within the meaning of [5 U.S.C. § 701(a)(2)]." 420 F.2d at 128. Our opinion made no mention of a "presumption of reviewability," though the dissent (per Wright, J.) did. *Id.* at 140. Our second en banc consideration of this general subject was *Adams v. Richardson,* 480 F.2d 1159 (D.C.Cir.1973), which not only involved the "agency discretion" exception, but considered its precise application to enforcement discretion. We again did not invoke any "presumption of reviewability" of enforcement decisions, but to the contrary found it necessary to distinguish the prosecutorial discretion cases on the grounds that (1) those cases "do not support a claim to *absolute* discretion," (2) the as-

sertion in the case before the court was not merely deficient enforcement "with regard to a few school districts in the course of a generally effective enforcement program," but rather "conscious[ ] and express[ ] [adoption of] a general policy which is in effect an abdication of ... statutory duty," and (3) the nonenforcement consisted not merely of inaction but of "affirmatively continu[ing] to channel federal funds to defaulting schools." *Id.* at 1162 (emphasis in original). (The centrality of the second point was emphasized in our recent en banc decision of *Adams v. Bell,* 711 F.2d 161, 166, 167 & n. 35 (D.C.Cir.1983).)

Nor are the panel opinions of this and other circuit courts cited by the majority any more probative of the novel assertion of a "presumption of reviewability" of enforcement decisions. None of them sets forth such a startling proposition, and all of them display special circumstances overcoming the usual presumption of nonreviewability. Thus, the case requiring an agency to enforce the restrictions of the Davis-Bacon Act (*Carpet, Linoleum & Resilient Tile Layers, Local Union No. 419 v. Brown,* 656 F.2d 564 (10th Cir.1981)) involved the third factor that we found operative in *Adams v. Richardson, supra:* the agencies were channeling federal funds to those in violation of the law. The split decision of a panel of this court in *Environmental Defense Fund, Inc. v. Ruckelshaus,* 439 F.2d 584 (D.C.Cir.1971), relied upon a statement by the agency making the very finding that triggered mandatory enforcement action under the governing statute; and while reviewing the generalized standard of proof which the agency had estab-

1. The majority asserts (footnote 25) that the Supreme Court itself has not interpreted *Overton Park* in this fashion, since it cited that case in *Dunlop* to support the proposition that the Secretary of Labor's exercise of enforcement discretion was reviewable. The majority overlooks, however, that both the portion of *Dunlop* in which the citation appears *and* the portion of *Overton Park to* which the citation refers, deal with the possible bar to review posed—*not* by § 701(a)(2), the "committed to agency discretion" provision—but by § 701(a)(1), which relates to statutory preclusion of judicial review.

As explained above, I do not dispute that the latter provision requires a clear expression of legislative intent.

2. The majority's response (footnote 23) fashions a mixture out of this dissent's quite separate assertions regarding Supreme Court case law, on the one hand, and the case law of this and other courts of appeals, on the other hand. I stand by the assertions, unmingled, and must leave it to the reader to dialyze the majority opinion.

lished for the exercise of its discretion, the court pointedly declined to review its finding as to whether that standard had been met. 439 F.2d at 595–96. (In the instant case, by contrast, the agency has made a finding that there is *no* "serious danger to the public health or . . . blatant scheme to defraud," Letter from the Commissioner at 3, Jt.App. at 88, and it is this finding which the majority claims power to review.) The panel decisions of this court in *Natural Resources Defense Council, Inc. v. SEC,* 606 F.2d 1031 (D.C.Cir.1979), and *WWHT, Inc. v. FCC,* 656 F.2d 807 (D.C.Cir.1981), are not apposite, since they involved refusal to conduct rulemaking, rather than enforcement discretion in the sense of a refusal to proceed against alleged law violators. And even in that context, the dicta of these cases do not support a presumption of reviewability in the sense here at issue. *Natural Resources Defense Council* states that the *totality* of § 701(a) (which reads "This chapter applies, according to the provisions thereof, except to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law") creates a "strong presumption of reviewability," 606 F.2d at 1043. Undoubtedly so. But that does not suggest that the presumption applicable to the totality of agency action is applicable to the narrow category of action consisting of refusal to adopt rules. To the contrary, the opinion makes it clear that with respect to that category "the relevant factors incline against reviewability," *id.* at 1047. As for *WWHT,* its dicta (which again are applicable only to the weaker case of refusal to adopt rules) are based upon a terminology which resolves the problems at issue here under the rubric of "scope of review" rather than "reviewability."[3]

The short of the matter is, that far from there being a "presumption of reviewability" with regard to enforcement determinations, the well known presumption is precisely the contrary. As the author of the majority opinion noted in dissenting from our en banc decision in *Curran v. Laird, supra:*

> This "presumption of reviewability" is often regarded as reversed for certain types of Executive actions. Actions relating to the conduct of foreign or military affairs have not normally been reviewed by the courts, absent exceptional circumstances. . . . Thus we would not normally review the failure of the Executive to exercise emergency powers granted it for the purpose of meeting the military needs of the nation.

420 F.2d at 141 (Wright, J., dissenting). Enforcement decisions are unquestionably one of those "certain types of Executive action" to which this analysis properly applies. Even those who favor general review of decisions not to undertake enforcement action acknowledge that it will constitute a change in the law, since "reluctance to review remains entrenched." Note, *Judicial Review of Administrative Inaction,* 83 COL. L.REV. 627, 658 (1983). The majority seeks to dismiss established law by citing Professor Davis for the proposition that "the real 'key lies in recognizing that the law has been in transition and that the case law * * [is now] strongly on the side of reviewability.'" Maj.Op. at 1187–1188, *quoting from* 2 K. DAVIS, ADMINISTRATIVE LAW TREATISE § 9.6 at 239–40 (2d ed. 1979). This also is misleading. The quoted statement was made in the context of a discussion dealing largely with the enforcement discretion of criminal prosecutors, which had previously been asserted to be not merely (as the cases establish with regard to the enforcement

---

**3.** When particular agency action can be set aside by the courts only for a narrow category of alleged infractions (*e.g.,* complete abdication of enforcement responsibility, *see Adams v. Richardson, supra*) it is possible to describe that situation by saying *either* that the agency action is not generally reviewable *or* that it is reviewable but "the scope of review [is] very narrow," *WWHT, Inc. v. FCC, supra,* 656 F.2d

at 809. In this opinion I have used the former formulation—not only because I prefer it but because that is what the majority has used, as is evident from the fact that all of the issues here discussed are addressed in that portion of its opinion entitled "Judicial Review of Enforcement Discretion," Maj.Op. at 1183, rather than the portion entitled "Scope of Judicial Review," Maj.Op. at 1188.

discretion of administrative agencies) *generally* unreviewable, but *entirely* so. As a refutation of that bald proposition, whether applied to criminal or administrative enforcement, Davis's statement is entirely accurate. But neither the statement, nor the cases upon which it relies, support any general presumption of reviewability in the sense at issue here.

Proceeding, then, from the premise that an agency's exercise or (*a fortiori*) nonexercise [4] of its enforcement discretion is generally unreviewable, one must consider whether there are any special circumstances justifying departure from that general rule in the present case. I am aware of none, and the majority opinion has assuredly not suggested any. Its reliance (footnote 29) upon the mandatory terms of the statute ("any person who violates § 331 'shall' be imprisoned or fined," citing 21 U.S.C. § 333(a) (1976)) is half-hearted, and properly so. Most of the criminal code is cast in such mandatory terms, and yet prosecutors' discretion not to indict is the archetype of unreviewable enforcement discretion. Besides which it is the Justice Department, rather than the FDA, that executes § 333(a). *See* 21 U.S.C. § 335.

The opinion places its major reliance upon what it calls the FDA's "Policy Statement," the relevant portion of which is set forth at page 1186. Even if an agency's failure to follow its rules regarding enforcement policy is reviewable (which may not be the case, *see e.g., United States v. Snell*, 592 F.2d 1083 (9th Cir.1979)); and even if the statement in question constituted an agency rule (which it did not, as will be discussed below); it is impossible to see how that "rule" has been violated here. The statement is full of flexible terms, the precise application of which was obviously intended to be, and could properly be, left to the discretion of the agency—for example, whether an unapproved use has become "widespread"; whether it "endangers the public health"; what particular action "is warranted to pro-

tect the public"; the meaning of the phrase "when necessary." *Legal Status of Approved Labeling for Prescription Drugs; Prescribing for Uses Unapproved by the Food and Drug Administration,* 37 Fed.Reg. 16503, 16504 (1972). Moreover, the last paragraph of the quoted excerpt, which is apparently intended to give *more* precise content to the first paragraph, suggests that the intended actions, as discretionary as they are, are only to be taken where "any person in the chain of distribution . . . does anything that directly or indirectly suggests to the physician or to the patient that an approved drug may properly be used for unapproved uses." *Id.* It applies, in other words, where misbranding has occurred—which (as will be discussed in the next part) is not the case here.

More fundamentally, however, the quoted statement is not an agency rule, and is indeed not even an authoritative policy statement. The majority's opinion gives it the title "Policy Statement" (which it never bore), *see* Maj.Op. at 1176 & n. 3, and uses that conclusory designation throughout. In fact, however, the statement was part of the policy justification set forth in a Notice of Proposed Rulemaking, *with respect to a proposal that was never adopted.* The paragraphs quoted by the majority, *id.* at 1186, and particularly the first of them, recite principles that are more specifically embodied in the subsequently recited text of the proposed amendment to 21 C.F.R., *see* 37 Fed.Reg. at 16504. It is remarkable to suggest that, although the text of the rule was rejected, the substance of that text was authoritatively adopted by the mere recital of it in the Notice of Proposed Rulemaking. Even if one is to accept (as I am not inclined to) the expansive dictum in two of our cases referred to by the majority that the term "rule" is "broad enough 'to include nearly every statement an agency may make,'" *Center for Auto Safety v. NHTSA,* 710 F.2d 842, 846 (D.C.Cir.1983),

---

**4.** It is interesting to note that Professor Davis's statement discussed in text applied only to decisions to prosecute. Even in the limited sense in which that statement is to be understood

(availability of review in *some* instances) it is not extended to "prosecutors' decisions not to prosecute," as to which "the law is still somewhat unclear." 2 K. DAVIS *supra,* § 9.6 at 244.

*quoting Batterton v. Marshall,* 648 F.2d 694, 700 (D.C.Cir.1980), surely the exceptions must at least include statements of principles that the agency is *thinking* of adopting but ultimately decides *not* to adopt. It is the height of irrationality to equate the prologue of a rejected rule with (what was involved in *Center for Auto Safety*) an agency's authoritative statement of its reason for withdrawing a notice of proposed rule. As *Center for Auto Safety* observed, *quoting from Columbia Broadcasting System, Inc. v. United States,* 316 U.S. 407, 416, 62 S.Ct. 1194, 1199, 86 L.Ed. 1563 (1942):

> [I]t is the substance of what the [agency] has purported to do and has done which is decisive.

710 F.2d at 846. Here, what the agency purported to do and did by its proposal and nonadoption was *nothing*—unless it was to *disapprove* the principles which the proposal and its prologue contain.

The opinion seeks to remedy this patent deficiency by observing that the "FDA still considers [the so-called Policy Statement] binding and to have substantive effect," Maj.Op. at 1186. That is not so. The majority's citation to support that conclusion is to a portion of the agency's Memorandum in Support of the Defendant's Motion to Dismiss, which (in turn referring to the Commissioner's letter response to the Appellants' request) only concedes that the Notice sets forth the agency's position on "the legal status of approved labeling for prescription drugs." Jt.App. at 131 n. 10.

That legal status has *nothing to do* with the rigid and detailed enforcement obligations which the opinion suggests the agency has imposed upon itself.

Thus, there is ultimately no special factor to support the extraordinary assertion of authority to control the agency's enforcement discretion in the present case—nothing, except the majority's disagreement with the agency's determination that no serious danger to the public health exists. But we are not the only public officials endowed with intelligence and worthy of trust, and our system of laws has committed the relative evaluation of public health concerns to others. Moreover, even if the clear erroneousness of an agency's reason for not conducting enforcement activities were a proper basis for our intervention (which it is not), there is no clear error here. Without belittling the humane concerns associated with the present complaint, it must be acknowledged that the public health interest at issue is not widespread death or permanent disability, but (at most) a risk of temporary pain to a relatively small number of individuals (200, which the majority swells to 1,100 by including prisoners under sentence of death in states that have *not* adopted lethal injection statutes). Moreover, it is not a matter of pain versus no pain, but rather pain of one sort substituted for pain of another—*and in all likelihood substitution of a lesser pain, since that is the principal purpose of the lethal injection statutes.*[5] In these circumstances, it is

---

5. *See* Gimlin, *Administering the Death Penalty,* Editorial Research Rep., Weekly Reminder Service, August 19, 1977:

> The public hanging, with its circus atmosphere, disappeared in America early in this century. But then the electric chair, installed as a more humane device for snuffing out life, has produced a host of grim stories from witnesses at the death scene. The gas chamber, usually regarded by penal officials as an improvement over the electric chair, requires a sealed room and a strapped-in victim . . . .
>
> Oklahoma and Texas have since moved in a new direction, providing for execution by lethal injection. "I think and I hope this will provide some dignity with death," Texas Gov. Dolph Briscoe said last May when he signed the injection bill into law, . . . Briscoe

could have added that for years veterinarians have considered the lethal injection the most "humane" way of putting hopelessly crippled or diseased animals out of their misery. The Report cited repeatedly by the majority, Royal Commission on Capital Punishment, 1949–1953 Report (1953), said that "intravenous injection, if practicable, would fulfill our three requisites [of humanity, certainty and decency] better than any other method." *Id.* at 257. The Report doubted, however, the method's practicability, on the basis of medical knowledge and technique thirty years ago, and therefore rejected it for the time being, but recommended, "unanimously and emphatically, that the question should be periodically examined, especially in the light of progress made in the science of anaesthetics, with a view to a change of system being proposed to Parliament

hardly clear error to determine that lethal injection statutes do not pose a "serious danger to the public health," justifying the diversion of FDA enforcement resources from other projects. Indeed, it seems to me the conclusion that they do pose a serious danger is fanciful.[6]

As for the "anachronistic ring" which the majority hears in all this (Maj.Op. at 1188 n. 36): If the clear statements of this court, see *Kixmiller* and *Action on Safety and Health, supra,* become downright anachronisms in nine years, we should perhaps stop publishing our opinions. I fancy, however, that the sound which the majority heard was not an anachronistic ring at all, but the stifled cry of smothered stare decisis, or perhaps the far-off shattering of well established barriers separating the proper business of the executive and judicial branches.

## II. JURISDICTION

If, however, the discretion issue is found against the FDA, it becomes necessary to establish the existence of FDA authority to take the requested action. The majority opinion fails to carry this point as well. It properly demolishes the agency's reliance upon state action, see Maj.Op. at 1179–1181, but does not address the more serious obstacle: FDA jurisdiction depends upon the existence of misbranding under § 331(k), which cannot be established under the facts of this case.

The majority opinion concludes and summarizes its discussion on the jurisdictional point as follows:

> The states' lethal injection statutes purport to mandate the use of certain prescription drugs for a purpose not listed on their label.... FDA *therefore* must have jurisdiction to regulate such activity.

Maj.Op. at 1182 (emphasis added). This progression of thought does not follow unless the opinion establishes the intermediate proposition that "using prescription drugs for a purpose not listed on their label

---

as soon as it can be shown that there are no longer any grounds for the doubts that now deter us from recommending it." *Id.* at 261. The Report's verdict concerning the alternative means of execution that these 200 prisoners will undergo if lethal drugs are not used is a good deal less qualified: "[W]e cannot recommend that either electrocution or the gas-chamber should replace hanging as the method of judicial execution in this country. In the attributes we have called 'humanity' and 'certainty' the advantage lies, on balance, with hanging." *Id.* at 256.

6. The majority opinion seeks to preclude consideration of the realities of the matter by asserting that the Commissioner "irrebuttably presume[d] that 'duly authorized statutory enactments * * * [which further] proper State functions' cannot, as a matter of law, pose such a danger to the public." Maj.Op. at 1190. That is not so. What the Commissioner wrote was that "[w]e cannot conclude that those dangers [of a serious risk to the public health or a blatant scheme to defraud] are present under State *lethal injection* laws, *which* are duly authorized statutory enactments in furtherance of proper State functions." Letter to the Commissioner at 3, Jt.App. at 88 (emphasis added). If, in that excerpt, the phrase "lethal injection" were omitted, or the word "which" were replaced with the words "since they," it would be possible to assert that the Commissioner was maintaining that no serious health hazard was presented *only* by virtue of the fact that these were state laws. As written, however, the excerpt refers to the specific nature of these laws ("lethal injection laws")—and therefore does not exclude from the Commissioner's calculus the factors discussed in text. The descriptive phrase, "which are duly authorized, etc.," reflects an important element in the Commissioner's analysis, but not necessarily the only dispositive one. To interpret the statement as an assertion that whatever is provided by state law will not be challenged by the FDA would render it quite incompatible with the Commissioner's statement in the preceding paragraph that "[w]e do not say, of course, that provisions of State law that are contrary to the Federal Food, Drug, and Cosmetic Act are lawful." *Id.*

There is no authority for the majority's assertion that the Commissioner's statement of "no serious danger to the public health" is not enough, but that he must "give rational reasons" why that is so. Maj.Op. at 1190 n. 43. Indeed, I know of no authority for the proposition that an agency must provide any ground for its refusal to comply with a request for exercise of its enforcement discretion, much less that it must provide the analysis underlying that ground. This seems to me one of those novel procedural requirements we have been told not to invent. *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978).

is unlawful under the FDCA." It makes no attempt to establish that proposition—principally I think, because it is impossible to do so. The FDCA is directed at the sale and distribution of drugs rather than their use. The only provision that could remotely apply here is the prohibition against "the doing of any ... act with respect to ... a ... drug ... [which] results in such article being ... misbranded," 21 U.S.C. § 331(k). Even if one adopts the extraordinary notion that a person causes an article to be misbranded by simply using it for a purpose not stated on the label, § 331(k) would still not apply, since—in accordance with the Act's focus upon sale and distribution rather than drug use—it requires that the misbranding occur "while such article is held for sale (whether or not the first sale) after shipment in interstate commerce." *Id.* Here the drugs are in the possession of the states' penal authorities. Under no conceivable interpretation of the English language could they be deemed "held for sale."

The majority opinion points out, quite correctly, that § 331(k) was added to the Act with the intent of expanding its application. Given the fact that the Act's primary application was to commercial transactions, it *was* a vast expansion to extend it to sales within a state after the first sale following shipment in interstate commerce. Nonetheless, that expansion was still limited to misbranding which occurs "while such article is held for sale." This is a statute that bears criminal penalties, and it is simply not possible to disregard this qualification entirely, as the majority would do. It is sometimes improper to "look only to the statutory language," Maj.Op. at 1181; but it is always improper—and opens the gates much more widely to judicial abuse—to ignore intentional statutory language entirely. Thus, I would acknowledge that the expansive intent of the amendment may be invoked to extend the statutory text to all "holding" that occurs while the drug is in the stream of commerce from manufacturer to ultimate consumer, *see United States v. Wiesenfeld Warehouse Co.,* 376 U.S. 86, 92, 84 S.Ct. 559, 563, 11 L.Ed.2d 536 (1964). But not beyond that point. Given the stat-utory language "held for sale," it is clear that when the House Report, quoted by the majority (p. 1181), said that the intent of the 1938 amendment was to "extend the protection of consumers contemplated by the law to the full extent constitutionally permissible," it was using the word "consumer" in the sense of "purchaser" rather than "ingester"—just as "consumer protection" refers to shoppers rather than gourmets, and the consumer price index to purchasers rather than eaters. Thus, in the context of discussion of this statute, the majority's notion of an "unwilling consumer," Maj.Op. at 1182, does not compute.

None of the cases relied upon by the majority to support the principle of expansive interpretation involves an expansiveness beyond the field of actual sale. *United States v. Sene X Eleemosynary Corp.,* 479 F.Supp. 970 (S.D.Fla.1979), involved the issue of whether the drug was "held for sale" when it was compounded with another substance for sale; *United States v. 10 Cartons Labeled, in Part, "Hoxsey",* 152 F.Supp. 360 (W.D.Pa.1957), held (erroneously, as later case law has established) that a physician can misbrand a drug by using it, as part of a paid-for therapy, for an unapproved use. Even those sharing the majority's apparent disdain for the plain meaning of statutory language would be hard pressed to explain why, to express the concept of *any* transmission to the ultimate ingester (as opposed to the ultimate purchaser) of the drug, Congress should choose the peculiarly inapt phrase "held for sale." And the consequences that ensue are as implausible as the interpretation that produces them: It cannot seriously be thought that the householder who administers a drug to his child for an unapproved use, or who places it in an unmarked bottle on his medicine shelf to administer later for an *approved* use, violates the criminal provisions of the Food, Drug, and Cosmetic Act. In short, even giving the phrase "held for sale" the minimum content it can possibly contain without reading it out of the statute entirely, it does not cover the holding by a state for purposes of coerced administration of the

drug to execute a sentence of capital punishment. In that context, the state is as much the ultimate consumer of the drug as it was of the electricity previously used for the same purpose; and the condemned prisoner executed by injection is no more the "consumer" of the drug than is the prisoner executed by firing squad a consumer of the bullets. Thus, misbranding has not occurred in the present case.

The majority opinion attempts, once again unsuccessfully, to condemn the agency out of its own mouth. The majority asserts that "[i]n both [prison clinical investigations and veterinary practices] FDA has rejected arguments that it does not have authority to regulate unapproved uses of approved drugs." Maj.Op. at 1180. But examination of the citations shows that in the first of these situations the Commission was proceeding not under the more general portions of the statute at issue here, but under its specific authority to regulate clinical testing of drugs, *see* 21 U.S.C. §§ 355(i), 357(d); 21 C.F.R. § 50.44 (1982); and that the second situation involved assertion not of authority to regulate use, but of authority to require proper labeling of drugs sold for a particular use. *See United States v. Beuthanasia-D. Regular,* [1979 Transfer Binder] Food Drug Cosm.L.Rep. (CCH) ¶ 38265 (D.Neb.1979). Of course even if the FDA had acknowledged what the opinion suggests, we are not in the habit of permitting an agency to expand its authority by simply acknowledging the legitimacy of such expansion. Except for special provisions such as that alluded to above pertaining to clinical or investigative drug use, there is nothing in the statute giving the Commission "authority to regulate unapproved use of approved drugs."

\* \* \*

The majority discerns that "the FDA is clearly refusing to exercise enforcement discretion because it does not wish to become embroiled in an issue so morally and constitutionally troubling as the death penalty." Maj.Op. at 1192. I doubt that. As discussed above, there were plenty of well supported reasons for the Commission to refuse to act. If speculations as to motivation are to be indulged in, I would suggest that the agency was properly refusing to permit its powers and the laws it is charged with enforcing from being wrongfully enlisted in a cause that has less to do with assuring safe and effective drugs than with preventing the states' constitutionally permissible imposition of capital punishment. This court should have done the same. It is our embroilment, rather than the FDA's abstention, that is remarkable.

I would affirm on the basis of the opinion below.